STATE

v.

Richard V. DiCARLO.

No. 2008–102–C.A.

Supreme Court of Rhode Island.

Feb. 1, 2010.

Virginia M. McGinn, Department of Attorney General, for Plaintiff.

Marie T. Roebuck, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Richard V. DiCarlo, appeals from the Superior Court's denial of his motion for a new trial, which motion he filed after a jury found him guilty of several offenses. This case came before the Court for oral argument on October 27, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the record, the memoranda submitted by the parties, and the oral arguments of counsel, we are of the opinion that cause has not been shown and that the case should be decided at this time.

For the reasons set forth below, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The complaining witness, Melissa,[1] was born on September 12, 1987. Early in the year 2006, Melissa accused her mother's live-in boyfriend, Richard DiCarlo (defendant), of having sexually abused her from 1997 through the first part of 2006. More specifically, Melissa accused defendant of (1) having digitally and orally penetrated her vagina and (2) having sexually touched her breasts, vagina, and buttocks. Melissa also alleged that defendant watched her shower through a hole in the wall. Melissa stated that defendant engaged in inappropriate sexual contact with her on a "day-to-day" basis and at "[a]ny chance he could get."

The above-summarized accusations were made against the background of a tumultuous family living situation. Melissa and her brother had lived for years in the same house as their mother and defendant in the towns of Glocester and Burrillville. However, the two siblings did not get along with one another, and they fought continually. The hostility came to a head during the week of February 13, 2006, when their mother told the two siblings that they would have to move out of the family home because of their inability to get along with one another. It was at that point in time that Melissa informed her mother and her maternal grandmother about the alleged acts of sexual abuse by defendant.

After making those accusations, Melissa presented her mother with the following choice: either defendant would have to move out of the home or else Melissa would "press charges" against defendant for having sexually molested her. Melissa's mother chose to allow defendant to remain in the home, and later that week Melissa reported the alleged sexual abuse to both the Glocester and Burrillville police.[2] The defendant was subsequently arrested; thereafter, a grand jury indicted him on two counts of first-degree child molestation sexual assault, in violation of G.L.1956 § 11–37–8.1; three counts of second-degree child molestation sexual assault, in violation of § 11–37–8.3; and one count of third-degree sexual assault, in violation of § 11–37–6.[3]

---

1. We shall refer to the complaining witness pseudonymously in order to protect her privacy and that of her family.

2. Melissa alleged that the molestation was perpetrated when the family originally lived in Burrillville and that it continued after they moved to Glocester.

3. Counts 1, 2, 3, 5 and 6 all referred to offenses that allegedly occurred between March 1, 1997 and December 31, 2001; at that time, Melissa was fourteen years of age or younger. Count referred to an offense that allegedly occurred between September 1, 2001 and September 30, 2003. (As to count 4, *see also* footnote 4, *infra*.)

A jury trial was held in the Providence County Superior Court on July 30 and 31 and August 1 and 2, 2007. The prosecution presented the testimony of five witnesses in addition to Melissa, namely: Melissa's brother; a high school friend of Melissa; a former neighbor of Melissa (who was also the boyfriend of defendant's sister); Melissa's former boyfriend; and the Burrillville police detective to whom Melissa had given her statement accusing defendant of sexual molestation. Those witnesses testified that they were told by Melissa, at various times and in varying degrees of explicitness, that defendant had touched or attempted to touch her inappropriately.

In addition to testifying on his own behalf, defendant presented the testimony of six witnesses, namely: Melissa's mother (who was also defendant's girlfriend); Melissa's maternal grandmother; and four family friends who knew both the defendant and the complaining witness. Those defense witnesses characterized defendant as a loving and friendly family man and as a hard worker; in contrast, five of the six defense witnesses characterized Melissa as untruthful.

After three days of deliberation, the jury found defendant guilty on the three counts of second-degree child molestation that were contained in the indictment, but it found him not guilty with respect to the two remaining counts that alleged first-degree child molestation.[4]

The defendant filed a timely motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure; the hearing on said motion took place on September 25, 2007.

At the hearing on his motion for a new trial, defendant contended that Melissa's trial testimony was not credible; he pointed to (1) the fact that she had made no reliable disclosures to others regarding the sexual abuse that she alleged had gone on for many years and (2) the fact that there was no physical evidence of the alleged "three thousand or so touches."

In support of his attack on Melissa's credibility, defendant contended that there was a "tremendous amount of evidence" which, in his view, militated against the credibility of Melissa's testimony. The evidence to which defendant alluded was: (1) the existence of occasions when defendant and Melissa were alone together but concerning which she did not allege that defendant had attempted to touch her; (2) the testimony of Melissa's brother as to his being unable to know when to believe and when not to believe Melissa and as to the fact that he had never witnessed anything improper occurring between Melissa and defendant; and (3) the "parade of defense witnesses, people who spanned [Melissa's] entire life," which witnesses, defendant contended, testified "consistently that they have never seen or observed anything or heard anything improper between Mr. DiCarlo and [Melissa]." The defendant further sought to buttress his argument that Melissa was not "worthy of belief" by pointing to the fact that her accusations of repeated sexual abuse over a ten-year period were made only *after* Melissa and her brother were told that they had to leave their mother's home.

At the conclusion of the hearing on the motion for a new trial, the trial justice denied the motion and explained on the record his reasons for doing so.

---

**4.** At the conclusion of the prosecution's case in chief, count 4 (the third-degree sexual assault charge) was dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

On November 9, 2007, defendant was sentenced to three concurrent terms of twenty years of imprisonment, with eight years to serve and the remainder suspended, with probation.

On appeal, defendant contends that the trial justice erred in denying his motion for a new trial. He argues that the trial justice overlooked and misconceived material and relevant evidence, that Melissa's testimony was neither credible nor reliable, and that the jury's verdict was against the evidence and failed to do substantial justice.

## II

### Analysis

In deciding whether or not to grant a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007) (quoting *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994)); *see also State v. Texieira*, 944 A.2d 132, 140 (R.I. 2008); *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *State v. Hallenbeck*, 878 A.2d 992, 1011 (R.I.2005).

The trial justice must carry out at least a three-step analytical process when passing upon a motion for a new trial. *State v. DeOliveira*, 972 A.2d 653, 665 (R.I. 2009); *see also State v. Rivera*, 839 A.2d 497, 502–03 (R.I.2003); *Banach*, 648 A.2d at 1367. First, the trial justice is to consider the evidence in light of the jury charge. *Morales*, 895 A.2d at 121. Second, the trial justice must then "independently assess the credibility of the witnesses and the weight of the evidence." *Id.* Thirdly, the trial justice must decide

whether or not "he or she would have reached a result different from that reached by the jury." *Id.*

If, after carrying out this three-step analytical process, "the trial justice agrees with the jury's verdict, the analysis is complete and the verdict should be affirmed." *Rivera*, 839 A.2d at 503. Further analysis is undertaken only when the trial justice does not agree with the jury's verdict. *Id.* That further (fourth) analytical step has been described as follows:

"In this fourth analysis, [the trial justice] must determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice. If the verdict meets this standard, then a new trial may be granted. However, the motion will be denied if the trial justice determines that the evidence and the reasonable inferences drawn therefrom are so nearly balanced that reasonable individuals could differ." *Id.*[5]

In addition, we have indicated that the "record should reflect a few sentences of the justice's reasoning on each point. * * * In providing a rationale for a decision, however, the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards." *Banach*, 648 A.2d at 1367; *see also State v. Girouard*, 561 A.2d 882, 890–91 (R.I.1989); *State v. Barnes*, 122 R.I. 451, 458, 409 A.2d 988, 992 (1979).

When we conduct our review, "we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in

---

**5.** *See also State v. DeOliveira*, 972 A.2d 653, 665 (R.I.2009); *State v. Imbruglia*, 913 A.2d 1022, 1028 (R.I.2007); *State v. Morales*, 895 A.2d 114, 121 (R.I.2006); *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994).

support of the ruling." *Texieira*, 944 A.2d at 140–41; *see also State v. Woods*, 936 A.2d 195, 197 (R.I.2007); *State v. Day*, 925 A.2d 962, 983–84 (R.I.2007); *Imbruglia*, 913 A.2d at 1028.[6] In addition, this Court "will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case." *Texieira*, 944 A.2d at 141 (internal quotation marks omitted); *see also State v. Bolduc*, 822 A.2d 184, 187 (R.I.2003).[7]

In rejecting Mr. DiCarlo's motion for a new trial, the trial justice commented that "[s]exual assault cases such as this, especially child molestation cases, where the complaining witness and the defendant each testify to starkly disparate scenarios, are particularly geared to close inspection by a jury." He further stated that "[c]redibility decisions are, after all, quintessentially within the province of the jury, and, moreover, jurors have the option of believing all or none of the [witness's] testimony * * *." He added that the jurors' choices "are not limited solely to those two extremes, because they can come down anywhere in the middle of a given [witness's] testimony that they think is proper and indicated."

The trial justice carried out the first two steps in the three-step analytical process when he addressed defendant's contention that the complaining witness's testimony was not worthy of belief. The trial justice stated that it is permissible for a jury to believe only parts of a witness's testimony and that it need not accept the entirety of the witness's testimony. He noted that the jury deliberated for three days before it reached a verdict; and he added that, even if the verdict did constitute a compromise, such a result was not at all impermissible. The trial justice stated that there need not be consistency in the verdict because "[e]ach count in an indictment is regarded as if it was a separate indictment." The trial justice reasoned that the jurors could have reached their verdict of guilty with respect to the charges of second-degree molestation and not guilty of the charges of first-degree molestation in a number of permissible ways. He also said that they may have disbelieved the charges of first-degree molestation or they may have thought that the complaining witness was exaggerating in some respects while being truthful in others. He further stated that, alternatively, the jury may have decided to compromise by finding defendant guilty of the charges of second-degree but not first-degree molestation.

In the case at bar, we are satisfied that the trial justice independently evaluated the evidence and weighed the credibility of the witnesses. In denying defendant's motion for a new trial, the trial justice stated that he found that the defense's own "character witnesses were, if anything, harmful to the defendant, not helpful." The trial justice went so far as to state that one of defendant's character witnesses "looked like a fool." He also noted that the testimony of defendant's other witnesses seemed "scripted." The trial justice indi-

---

6. In addition, the "moving party bears the burden of convincing this [C]ourt that the trial justice did not conscientiously apply these standards."; *see also Banach*, 648 A.2d at 1367; *State v. DaRocha*, 121 R.I. 182, 185, 397 A.2d 500, 502 (1979).

7. This Court employs such a deferential standard of review in the context of a motion for a new trial "because a trial justice, being present during all phases of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." *State v. Texieira*, 944 A.2d 132, 141 (R.I.2008).

cated that he "didn't believe" defendant's character witnesses, stating:

> "I thought it was a pretty well set up deal. I didn't find them credible. If the jury didn't, I don't blame them. You're asking me to sit independently and weigh their testimony. I did not find them believable."

The trial justice also took note of the fact that defendant chose to testify in this case; he commented that, by testifying, a defendant "runs the very real risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth." With respect to the jury verdict in this case, the trial justice stated that, "from [his] vantage point," he could not quarrel with the result reached by the jury.[8] The trial justice went on to state that "[a]t best" the jury verdict was one about which reasonable minds might differ; and he correctly noted that "under those circumstances, a new trial does not lie * * *." Accordingly, the trial justice was satisfied that the verdict should stand.[9]

This Court affords "a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *In the Matter of the Dissolution of Anderson, Zangari & Bossian*, 888 A.2d 973, 975 (R.I.2006); *see also DeOliveira*, 972 A.2d at 662 (stating that "the trier of fact is in the best position to assess the relative credibility of witnesses"); *Woods*,

936 A.2d at 198 ("We will not interfere with the hearing justice's conclusions with respect to the credibility of the complaining child-witness. We do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice and body language. Our perspective is limited to analyzing the words printed on a black and white record."); *Almeida v. Red Cap Construction, Inc.*, 638 A.2d 523, 524 (R.I. 1994) (stating that "[a] credibility determination is particularly within the province of the factfinder" and that such a determination will "not be lightly questioned by this [C]ourt").

As we have previously observed, "guilt or innocence often turns on the relative credibility of the [alleged victim] and the accused especially in the absence of eyewitnesses." *State v. Dennis*, 893 A.2d 250, 267 (R.I.2006) (internal quotation marks omitted); *see also State v. Izzi*, 115 R.I. 487, 490, 348 A.2d 371, 373 (1975) (stating that "the credibility of the complainant and defendant was crucial because of the absence of eyewitnesses to the purported crime"). Significantly, in the case at bar, the trial justice found that the witnesses who testified on defendant's behalf were not credible, and he perceived their testimony to be "scripted;" he bluntly stated that he "did not find them believable."

We conclude that the trial justice employed the appropriate analysis in his denial of defendant's motion for a new trial, and we perceive absolutely no basis in the record for ruling that the trial justice was either clearly wrong or that he miscon-

---

**8.** In so stating, the trial justice, obliquely but nonetheless adequately, carried out the third step of the analytical process described earlier in this opinion. *See Morales*, 895 A.2d at 121.

**9.** The trial justice acknowledged that this case involved a "most dysfunctional family;" but he also noted that, in the end, the jury was convinced that defendant had committed second-degree child molestation.

ceived or overlooked material evidence in denying that motion.

## III

### Conclusion

For the reasons discussed in this opinion, we affirm the judgment of the Superior Court. The record in this case may be remanded to that tribunal.